1

2                    THE UNITED STATES DISTRICT COURT
                   FOR THE CENTRAL DISTRICT OF ILLINOIS
3

4

5

6

   UNITED STATES OF AMERICA,              )
7                                         )
                            Plaintiff,    ) Criminal No.
8                                         ) 06-10033
            vs.                           ) Peoria, Illinois
9                                         )
   ADRIEN BENNETT, TERRY BENNETT          )
10  and NEASHON WASHINGTON,               )
                                          )
11                          Defendants.   )

12

13

14

15              EXCERPT FROM JURY TRIAL PROCEEDINGS
                        CLOSING ARGUMENTS
16                      FEBRUARY 20, 2007

17

18

19                           BEFORE:

20               HONORABLE MICHAEL M. MIHM
                 United States District Judge
21

22

23

24

25

```
 1                         APPEARANCES:

 2                    K. TATE CHAMBERS, ESQ.
                     BRADLEY W. MURPHY, ESQ.
 3                Assistant United States Attorneys
                    200 Fulton Street, Suite 400
 4                 Peoria Island, Illinois  61602
                 (Appeared on Behalf of the Government)
 5

 6                    JOHN P. LONERGAN, ESQ.
                 411 Hamilton Boulevard, Suite 1708
 7                   Peoria, Illinois  61602
                 (Appeared on Behalf of Adrein Bennett)
 8

 9                    MICHAEL J. PETRO, ESQ.
                    53 W. Jackson, Suite 1264
10                   Chicago, Illinois  60604
                 (Appeared on Behalf of Terry Bennett)
11

12                   WILLIAM C. LOEFFEL, ESQ.
                     139 E. Washington Street
13                  East Peoria, Illinois  61611
                (Appeared on Behalf of Neashon Washington)
14

15

16

17

18

19

20

21

22

23                     Karen S. Hanna, C.S.R.
                      U.S. District Court Reporter
24                     Central District of Illinois
25    Proceedings recorded by mechanical stenography, transcript
      produced by computer
```

1

### CLOSING ARGUMENT

2

### BY MR. MURPHY

3    Thank you, Your Honor.  May it please the Court,

4  all counsel, ladies and gentlemen of the jury.  My first

5  duty is to extend to you our thanks for the length of

6  service, first of all.  We did not intend to cause you to

7  labor this long on this particular case, but Mother Nature

8  had other plans and so we have all labored for more than a

9  week now with regard to this.  We thank you for your

10  patience and your willingness to serve.  I think I speak

11  for all counsel when I also say thank you to the other

12  judge in the courtroom, Judge Mihm, for maintaining the

13  atmosphere of decorum in which it's a pleasure to be an

14  advocate.

15    Some things haven't changed at all since we

16  started over a week ago.  The law is still the same.  The

17  defendants as they sit there now are presumed to be

18  innocent.  It is the Government that has the burden of

19  proof and we accept that burden of proof and that burden,

20  as the Judge has just reminded you, is proof beyond a

21  reasonable doubt.

22    The charges haven't changed.  We still have a

23  charge in Count 1 called conspiracy and I believe the

24  instructions will tell you in a few minutes that

25  conspiracy really is the idea that two or more persons

1    have agreed to do unlawful acts.  We still have Count 1,

2    the charge of the distribution of cocaine, and then we

3    have Counts 3 through 18, the charge of the distribution

4    of crack cocaine.  So the law and the charges haven't

5    changed.

6            I'm going to do at least one thing in reverse

7    order here.  Before I talk about the evidence, I want to

8    talk to you for a few moments about the verdict forms

9    because of the number of counts in this case.  And we

10   suggested early on you all try to take some type of notes

11   to keep the dates and the places and the persons involved

12   and the weights for each count separate.

13           You will receive for your deliberations for each

14   of Counts 1 through 18 a folder that separates out and has

15   for your consideration the appropriate forms for each

16   count.  Count 1, for instance, the conspiracy charge, will

17   have guilty -- a determination or a verdict form for you

18   to decide guilty or not guilty for each of the three

19   defendants of the charge of conspiracy to distribute a

20   controlled substance.  Count 1, you will also then decide

21   what the drug type is, whether it's cocaine base or if

22   it's cocaine base crack.  Count 1 will also have a third

23   form for you to determine and that is if you find the

24   defendants guilty, you should determine what is the weight

25   of the cocaine base crack involved in the conspiracy for

1    each of the three defendants.  The only other form or only

2    other folder that will have those kind of forms will be

3    Count 18 because it has a determination of guilty or not

4    guilty for the one defendant who is charged in Count 18

5    and that is the defendant Neashon Washington.  There will

6    also be a determination that needs to be made there as to

7    the type of drug, cocaine base or cocaine base crack, and

8    then the third determination in Count 18 as to the weight

9    of the crack.

10            The other verdict forms, Counts 3 through 17,

11   will be similar to one extent.  Each will have a

12   determination of guilty or not guilty for the person

13   charged and then there will be a second determination as

14   to the type of drug, cocaine base or cocaine base crack.

15   The reason I say "to an extent" is because not all of the

16   defendants are charged in all those counts, so you will

17   have to make your decision as to only the charged

18   defendant for that particular count.  We'll have a graph

19   later that I'll show you in my argument that will assist

20   you because we're going to -- at some point in my remarks

21   we're going to talk about the count, we're going to talk

22   about who specifically is charged and then the weight of

23   the drug.

24            So let's move on to the evidence, ladies and

25   gentlemen.  You should be at this point and time asking me

1    this question:  Well, what is the evidence with regard to

2    the conspiracy charge, that is this unlawful -- or this

3    agreement by two or more people to do something unlawful?

4    And here is my response.  To whom were the calls made?

5    Who made the delivery?  And, yes, I intend these to be

6    questions in response to your question.  Who drove and how

7    much did they deliver?  To whom was the call made?  Who

8    made the delivery?  Who drove?  And how much was

9    delivered?

10          The calls in all counts were made to the cell

11   phone of Adrein Bennett.  In Counts 2 through 17,

12   Mr. Bennett answered the phone.  You heard the agent talk

13   to Scrill, who is Adrein Bennett.  In Count 18, the only

14   thing different is that Neashon Washington answered the

15   phone that had heretofore been answered by Adrein Bennett,

16   but it was still Adrien Bennett's phone number that was

17   called.

18          Those calls to Adrein Bennett on the 17

19   different times, Counts 2 through 18, result in

20   distribution of controlled substances by five individuals:

21   Either Adrein Bennett delivered them, Terry Bennett was

22   there, Neashon either delivered or was there on several,

23   Kontyus Robinson was there and delivered on a few, and

24   then an unknown male delivered on at least one occasion.

25   Five individuals take action as a result of a phone call

1    to a single person, Adrein Bennett.  Does that show

2    concert of action to you?

3              So not only look at the actions, but look at the

4    words that you've heard in the evidence.  Look at their

5    own words, the words that were captured on the wires.

6    Look, for instance, on Count 7 where Mr. Bennett,

7    referring back to an earlier buy, talking to the agent,

8    says, "Remember that house you came to that I had Big T

9    out there?"  Here in Count 7 he's referring back to

10   Count 3, the buy involving Big T coming out of the house.

11   Mr. Bennett is telling you something there.

12             Later on Mr. Washington says, "What you got,

13   320?  You ain't on no police yet?"  Later Mr. Washington

14   says, "Hey, I hustle to die for this.  Hear me?  Don't be

15   on -- I'm saying don't be on no police yet."  Later, "This

16   is f-ing shit to die over, all right," the agent says.

17   And Mr. Washington says, "For real."

18             Later on in Count 13, near the end of the

19   transaction where Mr. Bennett is talking to the agent,

20   Mr. Bennett just flat out says, "I tell you, man, I'll

21   kill you, man."  Later he says, "I'll kill you."  Then his

22   final words on that tape, "I tell you, I'll kill you."

23             Ladies and gentlemen, what kind of a business is

24   so important that they would threaten to kill somebody if

25   they're police?  Well, an unlawful business of course.

1          Then on Count 18, the last of the buys in which

2    Neashon Washington is charged alone, when he answers the

3    phone Mr. Washington says that Scrill -- "This is not

4    Scrill."  The agent says, "Where's Scrill at?  Is he not

5    back yet?"  Mr. Washington says, "No, he's not coming.

6    This is his partner.  What's up?"  Partner in what?  Could

7    it be this illegal business that's so important to them

8    that they would threaten to kill someone for being the

9    police?  Note how important this business is to Adrein

10   Bennett even when he's not there.  He's got one of his

11   trusted cohorts with his phone to take care of business

12   while he's gone.  That's how important this business is.

13         Terry Bennett is stopped for driving

14   irregularly, to put it bluntly, on October 27 right in the

15   middle of these deliveries.  What does he have in his left

16   sock?  22.2 grams, cocaine base.  The witnesses say it's

17   crack.

18         What else do you remember?  Because you heard

19   testimony from Agent Brock on the outside of the

20   conspiracy trying to peek in, but you also heard testimony

21   from somebody on the inside, Doug Sherman, telling us

22   about business as usual.  These guys aren't users.  This

23   is a business.  That 22.2 grams was for the business.  He

24   wasn't a user.  Sherman tells you that the distributions

25   to Steve Brock are nothing more than business as usual.

1   Because during the two years approximately that Sherman

2   bought from this organization, what did he do?  He called

3   Adrein Bennett.  Sometimes Adrein delivered, sometimes

4   Terry delivered, sometimes Neashon delivered and sometimes

5   Kontyus delivered.  Folks, that's nothing but business as

6   usual coming from somebody who is on the inside.

7            In addition, because they're not users, what's

8   the crack on the plate with Adrein's fingerprints for?

9   Remember, this plate that's found is not in the kitchen,

10  but in an upstairs bedroom.  That plate, as Doug Sherman

11  said, is used also in the business.

12           This business, ladies and gentlemen, I submit,

13  in Counts 3 through 18, the ones in which the Government

14  has alleged the distribution of crack cocaine, the weight

15  involved in those 17 counts, 3 through 18, totals to

16  46.5 grams.

17           Connie, can you light up the board now?  I want

18  to walk with you through these distribution counts.

19  Count 2 is not up there because Count 2 was cocaine, 1.2

20  grams of cocaine.  It is different than these.  You saw

21  the evidence.  Ladies and gentlemen, on these distribution

22  counts you have the drugs, you've got the tapes, you've

23  got the photos, you've got the testimony of Agent Brock,

24  and I'm going to quickly summarize each of these counts.

25           In Count 2, the call was to Adrein Bennett.  The

1    delivery was made by Mr. Bennett.  However, his driver

2    that day was Neashon Washington and it was 1.2 grams of

3    cocaine.

4            Now we move on to Counts 3 through 18, the crack

5    cocaine deliveries.  The call -- Count 3.  The call was

6    made to Adrein Bennett.  The delivery is made by Neashon

7    Washington out of the house on Purtscher, 1.5 grams of

8    crack.

9            Count 4.  The call is to Adrein Bennett.  The

10   delivery is made by Adrein Bennett.  However, the driver

11   is Terry Bennett.  And something happened on that occasion

12   because the agent went up to the driver's side window.

13   The delivery was made over the top of Terry and the drugs

14   fell right in his lap.  0.9 grams of crack.

15           Count 5.  The call was to Adrein Bennett.  The

16   delivery is made by Neashon and Neashon was the driver as

17   well that day.  1.8 grams of crack.

18           Count 6.  The call was to Adrein Bennett.  The

19   delivery was made by Mr. Bennett.  The driver on that

20   occasion was Mr. Bennett, but who is the passenger?  It's

21   Neashon Washington.  You will recall on that particular

22   one, importantly, the agent came up to the passenger side

23   of the car, so the delivery was made over the top of

24   Neashon Washington, right in front of his nose.

25           The reason I mentioned Count 4 and Count 6

1    here -- I'll come back to it later -- the deliveries were

2    made on Count 4 in front of Terry Bennett's nose and the

3    delivery in Count 6 was made right in front of Neashon

4    Washington's nose by Adrein Bennett.  1.8 grams of crack

5    in Count 6.

6            The call was to Adrein Bennett on Count 7.

7    Neashon Washington delivers and is the driver.  3.0 grams

8    of crack.

9            Count 8.  Call to Adrein Bennett.  Adrein makes

10    the delivery.  However, the driver that day is Kontyus

11    Robinson, who is not a party to our case.  2.3 grams of

12    crack.

13            Count 9 and 10 happen the same day.  I believe

14    that was September 9.  Similar.  Both calls that day are

15    to Adrein Bennett.  Kontyus Robinson distributes both

16    times and is the driver.  1.6 and 2.3 grams of crack on 9

17    and 10.

18            Count 11.  Adrein Bennett received the call.

19    Adrein Bennett delivers.  Terry Bennett is the driver that

20    day.  3.2 grams of crack.

21            Count 12.  Adrein Bennett gets the call.

22    Kontyus Robinson does the delivery.  Doug Sherman is

23    driving that day.  4.1 grams of crack.

24            Count 13.  This is where Adrein Bennett is all

25    alone.  He gets the call.  He does the delivery.  He's

1    doing the driving.  3.7 grams of crack.

2              Count 14.  Adrein Bennett receives the call.  An

3    unknown male does the delivery.  However, Adrein Bennett

4    and Neashon Washington are both passengers in the vehicle.

5    Both of them are captured telling the agent to do the same

6    thing.  Do you recall what it was?  "Get back in the car."

7    They don't want to do their illegal business out in the

8    open.  2.9 grams of crack.

9              Count 15.  Adrien Bennett gets the call.  This

10   is where he delivers it in a sock.  There's an unknown

11   male driver.  3.5 grams of crack.

12             Count 16.  Adrein Bennett makes the call.

13   Neashon Washington drives and makes the delivery himself.

14   3.3 grams of crack.

15             Count 17.  Adrein Bennett gets the call.

16   Neashon Washington shows up.  He's the driver.  He makes

17   the delivery.  2.6 grams of crack.

18             Count 18.  The call is to Adrien Bennett's cell

19   number, but it's Neashon Washington that answers.  This is

20   the one, you recall, in which there is no driver because

21   Neashon shows up walking the dog.  This is the one in

22   which Neashon Washington says on the phone, "This is

23   Scrill's partner."  8.0 grams of crack.  For a total of

24   the crack on Counts 3 through 18 of 46.5 grams.  Those are

25   the distribution counts, ladies and gentlemen.

1          As I told you earlier, you will have to make

2    certain determinations on certain counts as to the drug

3    type.  Count 2, I believe all here in the courtroom are in

4    agreement that's cocaine.  The chemist told us it was

5    cocaine.  Our experts told us it was cocaine.  Doug

6    Sherman says it doesn't look like crack.

7          However, in Counts 1 and 3 through 18 you will

8    have to make a determination -- after the guilty or not

9    guilty determination, if you find the defendants guilty,

10   you will need to make a determination as to the drug type

11   there and that determination in Counts 1 and 3 through 18

12   will be whether it's cocaine base or cocaine base crack.

13         Remember, there is a type of cocaine base that's

14   not crack.  It's the paste that you heard the testimony

15   about that exists right after they process the leaf in

16   Columbia and Agent Marion said he had never seen it here

17   and that it isn't in any of these packages anyway.  But

18   you have to decide is this cocaine base or is this cocaine

19   base crack.

20         Both Sherman and Marion tell you that 2 is

21   cocaine and that's different from the drugs in Counts 3

22   through 18 because the drugs in 3 through 18 are

23   rock-like.  And when they crumble, they crumble into what?

24   Smaller rocks.  Whereas the cocaine crumbles into what?

25   This fine powder.  Officer Marion, I remind you, indicated

1    he had never seen the other type, other form of cocaine

2    base, that's the paste, in Peoria in his 12 years of

3    experience out there on the streets.

4              Now on Count 1 and Count 18, as I told you

5    earlier, you will have to make a determination as to drug

6    weight as well.  I submit to you, ladies and gentlemen,

7    that a combination of three things shows that the weight

8    of the drugs in this conspiracy is conservatively

9    115 grams.

10             Again, the question to Brad Murphy is, well, how

11   do you get there?  My answer is this.  46.5 were actually

12   delivered.  You have them here in court.  22.2 is taken

13   out of Terry's sock.  That alone gets you more than the

14   50, which is what the verdict form will refer to, more

15   than 50.  However, Doug Sherman testifies here that

16   significantly more was delivered to him as part of this

17   conspiracy.  Adrein Bennett delivered to him some 20

18   times, Neashon Washington 12 to 15 times and Terry Bennett

19   some 15 to 20 times.  A conservative estimate there would

20   be 45 grams I submit.  If you just take the low number

21   there, 12, 15 and the 20, that would be 47-ish.  The drug

22   weight for the conspiracy is more than 50 grams.  And I'm

23   excluding the weight of Count 2, the cocaine, because the

24   cocaine is not what's charged in Count 1.  The crack

25   cocaine is.

1              The further determination that you will need to

2    make is how much of that weight is each of these

3    defendants individually responsible for.  I would submit

4    to you that this is Adrien Bennett's organization.  The

5    evidence shows he's the go-to man.  He controls the phone.

6    That is, he controls who accesses his organization.  He

7    determines how much somebody can have, what the price is

8    and where he'll deliver it, all the conditions of delivery

9    if you will.  Adrein Bennett is, therefore, responsible

10   for all 115 grams.

11             Neashon Washington, I submit that you can simply

12   take him at his word.  He's a partner.  He's the partner

13   of Mr. Adrein Bennett.  You can use the same amounts for

14   him as well, more than 50 grams.

15             Terry Bennett, I submit that a conservative

16   calculation for Terry Bennett will be 22.2 grams in his

17   sock, the 4.1 grams of his two deliveries.  That's the two

18   counts in the indictment that he's there, Count 4 and

19   Count 11.  Those two total 4.1 grams.  And then the 15

20   grams that Mr. Sherman indicated that, at minimum, he was

21   responsible for.  If my math is correct, that comes up to

22   41.1 grams.  We don't have his words saying that he's the

23   partner as we do with Neashon.  If you don't find, ladies

24   and gentlemen, that he was as full a partner as the

25   others, then you should find that his weight is 41.1, in

1    other words between 5 and 50 grams for Mr. Bennett, Terry

2    Bennett.

3           I want to wind down my remarks now, ladies and

4    gentlemen.  You're going to hear from each of the three

5    defense attorneys here, you're going to hear from

6    Mr. Chambers, then you're going to hear from Judge Mihm.

7           I expect in the arguments that will follow mine,

8    you will hear argument with regard to whether this is

9    cocaine base or whether it's crack cocaine.  If you look

10   to one witness in this case -- actually you heard from

11   three different chemists, one by stipulation.  Joni Little

12   testified the first day, Terry Nielsen by stipulation the

13   last day, and then you heard from Aaron Roemer at length

14   about the buys 2 through 18.

15          Aaron Roemer, I submit to you, he knows cocaine

16   from cocaine base, from bunk, because you have an example

17   of each of the three in this case.  By his own testimony,

18   I submit, he hasn't called everything in this case cocaine

19   base.  He hasn't called everything cocaine.  He has shown

20   you why something is cocaine based on his testing.  He has

21   shown you why something is cocaine base based on his

22   testing.  He has shown you why something is bunk because

23   he can't find any scheduled substance there.

24          You know, if you're sick, you probably consult a

25   doctor.  If you have legal troubles, you probably consult

1    a lawyer.  If you want to know the molecular makeup of

2    something, I submit that you contact a chemist, which is

3    what he is, because that's their expertise.  The real

4    experts in this case on crack cocaine, however, are people

5    like Doug Sherman and Loren Marion who are out on the

6    streets because, you will recall, it's a street term.

7    It's the people on the streets that know it's crack.

8            You may hear from one or more of the attorneys

9    in argument that, "Well, my client was just there."  It's

10   called mere presence.  Now I go back to my earlier remarks

11   about Count 4 and Count 6.  Remember Count 4 where the

12   call was to Adrein Bennett?  Adrein Bennett did the

13   delivery and drops it in Terry's lap.  Who is the driver?

14   Was he more than just there?  He certainly knew it was

15   crack cocaine going across his lap.  How do you know he

16   knew it was crack cocaine?  Doug Sherman tells you he knew

17   what crack cocaine was.  No innocent bystander there.  He

18   drove Adrein Bennett for a purpose.  That was his job that

19   day, his job in the business.

20           Count 6.  The call was to Adrein Bennett and

21   Adrein drove and made the delivery, but in Count 6 it's

22   right over the top of his passenger, Neashon Washington.

23   Neashon is no innocent bystander there.  He had to see

24   this drug deal that happened right in front of his nose.

25           Ladies and gentlemen, the verdicts in this case

1    that are warranted by the evidence are verdicts of guilty

2    because the evidence shows that.   Review your notes.

3    Discuss freely amongst you your recollections.   I submit

4    to you that you will return those verdicts.

5              I leave you with the words of Doug Sherman.

6    Remember what one of the very last answers he gave on the

7    witness stand was?   He said being a drug addict is a

8    miserable existence.   I think you can tell from listening

9    to his story here just really how miserable it is.

10              I submit to you, ladies and gentlemen, that

11    sitting here in this courtroom, Neashon Washington, Adrein

12    Bennett and Terry Bennett back here against the wall,

13    these are the type of individuals who profit from the

14    miserable existence of others.   They are the ones that

15    purvey this scourge called crack cocaine and they do it

16    for profit.   And yet they are the same individuals,

17    through their attorneys, who will ask you, "Don't believe

18    a word Doug Sherman says because he's a miserable retch."

19    Well, they helped make him what he is, ladies and

20    gentlemen.   You factor that into your determination of

21    Doug Sherman's credibility as a witness.   I submit that

22    the agreements that Doug Sherman made with the Government

23    are agreements that would tend to bring the truth out of

24    him.

25              I urge you, ladies and gentlemen, in your

1   determinations as to the guilt of the defendants, as to

2   the type of drug and as to the weights involved that you

3   be fearless in your duties.  Thank you.

4            THE COURT:  Thank you.  Who's going to go first?

5   Mr. Loeffel?

**CLOSING ARGUMENT**

**BY MR. LOEFFEL**

8            Good morning.  My name is Bill Loeffel.  My

9   client is Neashon Washington.  We thank you for the

10  attention that you have paid to this case over the last

11  week.  I will now speak briefly on Mr. Washington's

12  behalf.

13           I ask, as I did in my opening statement, that you

14  continue to keep an open mind.  I ask you to remember that

15  even though the defendants are being tried together, you

16  must give my client, as each defendant, separate

17  consideration and you must analyze the evidence about each

18  defendant, leaving out consideration of any evidence that

19  is admitted solely against another defendant.  We realize

20  that this is a big job.  We do place our faith in you.

21           Mr. Murphy, who as the Government's attorney has

22  the burden of proving beyond -- each and every element of

23  the Government's charges beyond a reasonable doubt, has

24  given his closing statement, but what he said is not

25  evidence.  The evidence came from the witness stand and

1    through the exhibits that were presented to you.  Now in

2    commenting on the evidence, I will relate to you what I

3    recollect, as Mr. Murphy stated to you what he

4    recollected, but guess what?  The only thing that really

5    matters is what you recollect.

6         In evaluating the Government's case, it is very

7    important that you consider carefully what the witnesses

8    said and then think very hard about what was not said.

9    You must consider these two things together because in the

10   case you have before you, I submit absence of evidence

11   shows absence of conspiracy.

12        What do I mean by this?  The Government has

13   charged my client with being a participant in a

14   multi-party conspiracy in which he's charged with being

15   responsible for over 50 grams of cocaine base crack and

16   that, in the words of their indictment, he knowingly did

17   conspire, confederate and agree with other persons, namely

18   Adrein Bennett, Terry Bennett, Douglas Sherman and Kontyus

19   Robinson, between 2004 and 2006, to knowingly distribute

20   cocaine base crack and that this conspiracy involved more

21   than 50 grams.

22        I submit to you that the Government has charged a

23   lot, but the evidence falls a bit short, like we see in so

24   many conspiracy theories.  What the evidence does show --

25   and we'll not dispute this -- is that there were piecemeal

1    individual drug deals, yes, many involving Neashon and one

2    other person.  There is evidence Neashon may have known

3    some of the other named parties, but there is not evidence

4    that he formed a multi-party conspiracy with them.

5            This conspiracy is a big deal.  However, Neashon

6    was totally unknown by Agent Brock when he first

7    encountered him on July 25 of 2005.  There were some

8    purported transactions in August.  There were some in late

9    October and early November.  But then you don't hear from

10    Neashon again after December of 2005.  Some record for a

11    person who Mr. Murphy represents as a full partner in this

12    enterprise.

13            Now let's talk about conspiracy.  I believe that

14    you will be instructed that a conspiracy is an agreement

15    between two or more persons to accomplish an unlawful

16    purpose.  We certainly do not dispute that through a

17    certain telephone account, certain drug deals were

18    arranged with Neashon, but these only involved somewhat

19    over 20 grams.  I'll show you.  Adding them all together,

20    all together, you come up with about 24.9.  But I'll talk

21    to you -- I'll break those down to you later.

22            What is important for you to note now is that the

23    Government has not linked all the parties together in a

24    common criminal enterprise.  In evaluating the evidence,

25    please look very hard at whether what may have been

1  criminal actions by other persons could be considered

2  reasonably foreseeable by my client.

3          There is no evidence that would show beyond a

4  reasonable doubt that Neashon entered into any agreement

5  with Kontyus or Terry or Douglas Sherman to further a

6  common criminal purpose.  If we refer back to those videos

7  that we watched, recall, Neashon was not observed in the

8  presence of those persons.  There is no evidence showing

9  beyond a reasonable doubt that there was a common purpose

10  to the acts of the parties or that the actions of others

11  were to my client, Neashon, a foreseeable consequence of

12  any agreement that he may have had with one other person,

13  that person being Scrill.

14          I'll submit to you that a conspiracy is like a

15  structure and the greater the number of members, the

16  greater the complexity.  I believe that you will be

17  instructed that the Government has the burden of proving

18  beyond a reasonable doubt that there was a common purpose,

19  that Neashon was aware of this common purpose and that he

20  actively and willingly participated in criminal activity

21  directed towards that common purpose.

22          Now in evaluating the evidence, let's keep one

23  thing in mind and that is that the Government had

24  overwhelming resources available to investigate this

25  alleged multi-party conspiracy.  As Agent Brock and Agent

1    Marion testified, there are specialized units dedicated to

2    investigating drug crime in this area.  From Special Agent

3    Meyer, we learned that the FBI was involved in this

4    investigation and we learned that law enforcement had all

5    sorts of capabilities in this investigation.  They made

6    surveillance videos.  They recorded phone conversations.

7    They ran a confidential informant.  They tracked every

8    phone call made from Adrien Bennett's phone over a period

9    of months.  But despite all that, the only evidence that

10   you end up with was evidence of individual street buys and

11   the highly questionable testimony of Douglas Sherman and,

12   as Mr. Murphy points out, the car stop on October 27,

13   2005.

14        Let's talk about tools of the trade because the

15   Government believes tools of the trade are important.

16   And, oh yes, they are.  If this is a business, a big

17   business, a big conspiracy like they're making up, you

18   need certain things.  For instance, the Government

19   believes that firearms are crucial evidence of the

20   existence of a conspiracy, but there's no evidence that

21   Neashon possessed a firearm during the time period that

22   they presented.  He was always unarmed.

23        The Government believes that it is important that

24   they establish that there's a crack house, a business

25   location where cocaine base crack is produced and

1    packaged, but there's no physical evidence linking Neashon

2    to such a house, little evidence whatsoever that there was

3    such a house.

4         There's little evidence of how Neashon would have

5    kept track of the activities of others.  Let me make that

6    no evidence.  He did not have a cell phone account and was

7    very seldom seen with a phone or using one.  Even by the

8    Government's account, only in Count 18, and I have some

9    real disagreements with the Government as to what was

10   portrayed in 18, but I'll get to that in a minute.

11   There's no evidence that he maintained or had access to

12   records of money or drug product flow.

13        Now let's say you do have a big conspiracy.  If

14   you're not the one that's doing the tracking of criminal

15   activity, that is keeping the records or at least having

16   access to them or at least there even being records, you

17   know you're not in a good position to foresee criminal

18   activities by others.  Therefore, not reasonably

19   foreseeable.

20        Now let's talk for a minute about Douglas Sherman

21   because the Government would like you to believe that

22   Douglas Sherman fills in some of these gaps, but his

23   testimony, I submit to you, is worthless.  You can't give

24   much credence to a defendant who smoked, by his own

25   admission, $55,000 worth of what he calls crack, a

1  defendant who bought drugs several times a week and who

2  was constantly high, but yet who would have us believe

3  that doesn't affect his memory.  You can't give much

4  credence to a defendant who made his statement for the

5  express purpose of keeping himself out of prison.  You

6  can't put much credence in his statements considering that

7  while he's been in whatever program it is, he has

8  committed violations and would certainly seem to count on

9  the good favor and will of the Government to keep him out

10 of prison and you can't put much faith in the testimony of

11 a defendant whose trial testimony does not match his

12 earlier statements.

13          Now let me make one other point about Douglas

14 Sherman.  Just assume for a minute that you believe every

15 word he says, especially about these deliveries.  And keep

16 in mind, I believe I was the only one who actually pinned

17 him down on specific numbers and quantities.  Now the

18 Government would have you believe that every drug

19 delivered to Douglas Sherman is a drug that should be

20 accounted for weight purposes to the conspiracy, but

21 Douglas Sherman said that these deliveries were for his

22 own consumption.  He smoked up the stuff.  This then, at

23 most, would be a delivery within this group, therefore

24 logically cannot be said to be an amount that people

25 conspire to distribute outside the group, so let's not

1     give credence to that weight.

2              Some other weight that I would not like you to

3     give credence to would be that that was taken during a

4     certain car stop on October 27 because there's no link

5     between that and the conspiracy.

6              Now let me suggest to you that in some ways a

7     conspiracy can be likened to a house of cards.  All things

8     are interrelated and when you strike a severe blow to one

9     part of it, you will get an effect on another.  But as

10    we've seen from the evidence that was presented on the

11    October 27 stop, what do you know?  Less than a week

12    later, November 2, here we have allegedly another

13    delivery, as if nothing had happened.  Agent Brock

14    actually testified, business as usual.  Therefore, I would

15    submit to you that that October 27 stop is actually just

16    the opposite.  It's evidence that there was not a

17    conspiracy because these things were totally unrelated.

18             So now let's talk about the individual counts and

19    what the evidence does show us.  Well, it shows us

20    individual buys, individual deals.  And you today will be

21    called upon to do more than just make a decision as to

22    whether there was a conspiracy or not or how many people

23    were involved or how much drug weight was involved or how

24    much is attributable to these people.  You also have

25    specific counts out there and you're going to be called

1    upon to make a determination as to whether my client was

2    guilty or not guilty of individual deliveries and those

3    are contained up in the counts that I have put up on the

4    overhead here.  Counts 3, 5, 6, 7 are all being grouped in

5    about the August time period, and 14, 16, 17, 18, that's a

6    one-month period from mid-October to mid-November.

7         Now briefly a word about what was involved.

8    You're going to be called upon to make a decision as to

9    whether these alleged deliveries actually took place and,

10   if so, whether they involved cocaine base crack, as it's

11   called, or cocaine base.

12        Now I submit to you that the evidence presented

13   through the experts was pretty clear and that there is a

14   difference between cocaine base and what we would refer to

15   as cocaine hydrochloride, what's the subject in Count 2,

16   but what was fuzzy all along is what is the real

17   relationship between cocaine base, which can positively be

18   identified by any forensic chemist, and what's known as

19   cocaine base crack.  I submit to you that cocaine base

20   crack is a fuzzy concept, fuzzy, and just to -- I think I

21   can sum it up with just a few words.

22        If you look at the words of whom the Government

23   would say are the real experts, you'll see that that is

24   the cops who are involved in these investigations and the

25   people on the street that buy it.  You'll see that Exhibit

1    No. 2 was definitely identified as crack by their

2    confidential source and by their experienced undercover

3    officer, and yet we found out it was not in fact what

4    anybody would call crack or even cocaine base.

5              When I had Officer Marion on the stand, he was

6    asked to give a definition and his definition was that,

7    "Well, I consider" -- if I recall correctly, he considers

8    crack to be any hard, off-white substance.  I said, "So

9    you don't consider the hydrochloride molecule, do you?"

10   He says, "Well, really you can't."

11             So I would say that there's some real problems

12   with that street identification.  I submit to you it's a

13   fuzzy concept and, as such, I would ask you to, if you

14   must make findings, make the findings that can be

15   corroborated by chemical science.  That is we know some

16   things are cocaine base.  Leave it at that.

17             Now to the individual deals, the individual

18   counts.  In reviewing the evidence in each and every one

19   of these, we must remember that we're dealing with humans

20   who are subject to some errors, some faulty memories,

21   sometimes some mistakes.  We all make mistakes.  If you

22   just want me to point out say three mistakes, I can do

23   that real easily.

24             One:  I'll submit to you that when we had

25   Officer Zach Benne, one of the Government's early

1    witnesses, on the stand -- you know, he was the one that

2    was kind of shaky when he was holding the microphone.  I

3    will submit to you that he misidentified my client as

4    somebody else or when asked to identify somebody else, he

5    pointed at my client, the direction of my client, and

6    said, "The guy in the tan pants."  My guy is the only one

7    in the tan pants.  We know for sure that it wasn't my

8    client.  But, again, I'm just saying, well, the officer

9    was just mistaken.  That's all.

10        I recall when we had Agent Brock up on the

11    stand, he was asked to testify to the events of August 24.

12    He was shown Exhibit 6-A and 6-B, which actually were

13    relating to a different date, and he was asked, "Well, do

14    those truly and accurately portray what happened on that

15    day?"  He said, "Yes, they do."  Well, he corrected

16    himself pretty quickly after that, but there's a mistake.

17        Also, I believe there was a mistake when there

18    was -- when Agent Brock was originally commenting on the

19    events that transpired regarding Count 6 and that he

20    originally had my client and another person kind of

21    flip-flopping as to who was the driver, who was the

22    passenger.  He corrected himself, I believe, after the

23    video was shown.  What does that show?  That just shows

24    people's memories are faulty.

25        You did get a lot of extremely good pervasive

 1    evidence here and that came in the form of videos and

 2    audios.  And I'm glad it's there because, you know,

 3    sometimes it actually shows that what an officer said did

 4    happen did not in fact happen.

 5            An example:  August 24 transaction, Count 7.

 6    Agent Brock said that my client threatened him, said that

 7    he would take care of him or he was somebody that he'd

 8    better not mess with.  I said, "Well, we've got the

 9    transcripts here.  Where does it show that in the

10    transcripts?"  Well, it wasn't it turned out.

11            And today -- I think this is very important.

12    With respect to Count 18, that final transaction when the

13    agent called the home or called the phone that was a

14    attributable to -- excuse me -- yes, attributable to

15    Adrein, or it was Adrien's account, Mr. Murphy says

16    Neashon answered the phone.  No.  No.  No.  I think that

17    what it showed was that an unknown male answered the

18    phone.  Later there was a second conversation where

19    Neashon says, "I'm here.  Where are you?"  But as far as

20    anything about Neashon being identified as the person who

21    said, "I'm a partner", well, I would ask you to think very

22    hard about your notes and your recollections about that

23    because I don't see it that way.  But, once again, what

24    matters is what you recollect.

25            There are two counts that I will refer to

1    specifically and I would like to just go over specifically

2    and briefly.  Those are Count 6 and Count 14.  Now if you

3    recall, in Count 6, the incident of August 18, my client

4    was present in the passenger seat of a car while

5    purportedly a drug deal took place.  Now did he hand drugs

6    to anybody?  Did he accept money?  No.  He was just there.

7    Whatever took place took place over him, so I submit he

8    was in fact on that one merely present.  Did he aid, abet,

9    direct anybody to do anything?  He did not.  He was merely

10    there.

11              Now the same applies to Count 14.  In that

12    count, that was the one at the car wash and the officer

13    testified, "Well, I got there.  I got out of my car.  I

14    started walking over to the car and these two people", my

15    client being one of them, "said get back in your car,"

16    purportedly, in the mind of the officer, so some unknown

17    person could do business with some other unknown people.

18              Well, once again, I submit to you, how does that

19    show anything other than mere presence?  I did go over

20    that with the officer when he was on the stand.  I said,

21    "Well, did Neashon conduct a deal?  Did Neashon take

22    money?  Did Neashon deliver drugs?"  No.  I believe that

23    the Government's response to that may be, well, he was a

24    bodyguard.  Well, no, no.  If you recall, Neashon was

25    never armed.  What would he have been guarding anybody

1    from?  I mean, they were doing whatever they were doing

2    with Agent Brock who was purporting himself to be a skinny

3    naive kid from Morton.  I don't think anybody needed

4    protection from him.

5           So now to sum up, the evidence that you have

6    there shows transactions involving, at most, 24.9 grams.

7    If you're actually talking about hand-to-hand with my

8    client, less than that because you would have to knock out

9    Count 6, the 1.8, and Count 14, the 2.9.

10          To sum up, I'll not dispute that some criminal

11   acts were committed, were committed by my client, but I

12   urge you to resist any temptation to find him guilty of

13   everything because he may have been involved in some

14   individual criminal acts because, as we have shown, the

15   link is just not there.  Please review each charge and

16   each element and evaluate them on the basis of the

17   evidence presented on that particular charge and do my

18   client justice.  Thank you.

19          THE COURT:  Thank you.  I think we're going to

20   take a break.  Please go to the jury room.  Do not discuss

21   this case.

22      (Following held outside the presence of the jury)

23          THE COURT:  Counsel, just so we're all clear on

24   what I'm going to read to the jury when we get to that

25   point, I'm going to read all the other instructions and

 1   then when we get to the verdict forms, I'll read

 2   everything involving Count 1, Count 2, Count 3.  I'll

 3   indicate that Count 3 is an example of what all the other

 4   counts are like.  Then Count 18, I'll also cover that one

 5   because of the special interrogatories, but I don't intend

 6   to read every verdict.  Any objection to that?

 7              MR. CHAMBERS:  No objection.

 8              MR. LONERGAN:  No.

 9              MR. LOEFFEL:  No objection.

10              MR. PETRO:  No, Judge.

11              THE COURT:  We'll be in recess.

12                   (Recess taken)

13         (Following held in the presence of the jury)

14                     **CLOSING ARGUMENT**

15                    **BY MR. LONERGAN**

16         Hello again, ladies and gentlemen.  Again, my

17   name is John Lonergan.  I represent Adrein Bennett.

18   Because of the complexity -- I want to thank you again for

19   your service.  I know Adrein wants to thank you.  As I

20   said in the beginning of this case, your service is

21   probably the most important part of our system and so we

22   thank you for that.

23         This is a pretty complex case.  We have a lot of

24   different people.  We have 18 counts that you're going to

25   have to make a decision on and I'm stuck having to argue

those points and these issues that were raised during the course of the evidence in this case, so I'm going to be making what are called alternative arguments.  I want to stress to you when I make an alternative argument, I'll tell you my first argument is this.  Find my client not guilty on the 18 counts.  Given some of the evidence, that may be difficult for you to do.  So what I'm going to do is argue specific points on specific counts and when I do that, I by no means am conceding anything.  I'm still maintaining my client's innocence on this case.  But I'm going to have to argue certain things because of the substances that are involved and the possible weights that you're going to have to consider, so I'm going to have to do an argument where I say, "Find him not guilty of this count.  But if you find him guilty of this count, this is what I want you to do as far as those other questions you have to answer."

Again, Mr. Murphy went over it, the verdict forms.  Every count has a verdict.  Every count that involves my client has a verdict form with his name on it that says "guilty" or "not guilty".  Only if you find him guilty of any particular count do you have to answer that next question, whether it was cocaine base, cocaine base crack, in certain cases what is the weight of the drugs involved.

1              So, having said that, the first count we're

2    dealing with here is the count of conspiracy.  I will not

3    expound very much beyond what Mr. Loeffel has said.  I

4    thought he did an outstanding job of pointing out the

5    issues in the conspiracy.

6              Mr. Murphy referred to my client as having an

7    organization, talked about his organization.  I don't know

8    what organization there was, folks.  Near as I can tell,

9    we're talking about a lone man with a cell phone who

10   doesn't even have a car.  That's his organization.

11             Now there are several specific counts and I'm

12   holding up the list that Mr. Murphy displayed earlier and

13   I think Mr. Chambers will likely use again.  I want to

14   talk about the issue of these telephone calls to a cell

15   phone that's owned or I guess subscribed to by Adrein

16   Bennett.  There's no question, we have agreed, that that

17   cell phone was in his name and that number that was called

18   by the agent or the confidential informant was the number

19   that went with that phone.  Seventeen of these counts

20   start with that telephone, seventeen counts where the

21   agent or the -- in the first count, Count 2, the

22   confidential informant calls the phone owned by Adrein

23   Bennett.

24             Now when Agent Meyer from the FBI was going over

25   the phone records, it was extremely tedious listening to

1   all the phone calls and I know everyone did everything

2   they could to pay attention.  But Mr. Meyer doesn't know,

3   did not testify as to who answered that phone.  But we got

4   to a point where there were so many counts, he said,

5   "Agent Brock called Adrein Bennett.  Agent Brock called

6   Adrein Bennett", over and over again.  There was times

7   when he said, "This number to this number."  There was

8   times where he said, "The phone owned by Adrein Bennett."

9   And then eventually it just got to be, "Let's just get

10  Adrein Bennett.  Adrein Bennett."

11          Then he testified that he met him, that he spoke

12  to him, and he was certain that in every one of those

13  phones calls, except for the last two he made, that this

14  was Adrein Bennett.  This is what I'm going to refer to as

15  voice identification.  In other words, you dial somebody's

16  number.  You talk to a person on the other end and you're

17  certain that's the person you think you're talking to.

18  But I submit to you that we have all had occasions in our

19  life where we called somebody and the person who answered

20  the phone we're certain is who we were calling only to be

21  told "Oh, no, you want to talk to my dad" or, you know,

22  "You want to talk to my mom."  When I call my

23  brother-in-law, his 18-year old son answers the phone.

24  "Hey, Darren, how are you?"  "It's not Darren.  It's

25  Michael."  "Oh, could I talk to your dad?"  "All right."

1   These are people you may have known your whole life.

2   These are people you have a lot of contact with.

3           18 counts, 17 of which involve that telephone.

4   That's all the contact Agent Brock ever had with the

5   person on the other end of that phone.  Then he had some

6   personal contact with Adrein Bennett, the videotapes you

7   saw where he saw him in person and maybe even spoke to

8   him.

9           Now it's much easier to identify a person by

10  sight because their appearance is usually going to be

11  fairly consistent.  Things about your face and

12  identifiable features don't change.  But when you talk to

13  somebody on the telephone, their voice sounds different.

14  I don't think that's an argument.  I think that's a fact.

15  When you talk to somebody on the phone, they don't sound

16  exactly the same as they do when you talk to them in the

17  same room across from them.

18          So I submit to you that the telephone calls to

19  Adrien Bennett's phone, you cannot assume or presume that

20  he was the person on the other end of that line.  In

21  Counts 3, 5, 7, 16 and 17, if my recollection is correct,

22  Adrein Bennett is in those counts identified only as the

23  person who was allegedly on the other end of the

24  telephone, allegedly identified by Agent Brock based on

25  prior phone conversations and a very little bit of limited

1    contact.

2            Again, going back to the issue of voice

3    identification, we -- well, I won't speak for anybody on

4    the jury.  I misidentify voices frequently on the

5    telephone because I'm -- when I make the call, I presume

6    that the person I'm calling is going to answer the phone

7    and when I hear a male voice or female voice, whoever I'm

8    calling, that's who I think it is.

9            He's presuming Adrein Bennett is going to pick up

10   the phone.  One, he has had contact with him at least once

11   prior to that.  Number two, it's a phone registered in his

12   name.  But, altogether, between all of these cases, all

13   the counts I should say, we have had maybe ten minutes of

14   verbal interaction.  Add them all up.  Maybe, maybe ten

15   minutes.  Between the in-person and the telephone calls,

16   that's it.

17           And Agent Brock testified confidently because

18   that's what he is trained to do.  He probably believes

19   that he's accurate in saying that that's the person who

20   answered the phone call except there is no evidence other

21   than that that says that's who answered the phone.  So on

22   Counts 3, 5, 7, 16 and 17, I'm asking you to find

23   Mr. Bennett, Adrein Bennett, not guilty because there's no

24   evidence tying him to those purchases other than that

25   voice on that phone that happens to be in his name.

1          Count 18.  The agent called that number and got

2     apparently, he says, Neashon Washington.  In an incident

3     after that, the bunk buy as we're going to call it now, he

4     called the phone and some other person, then another

5     unknown person, delivered the -- I guess the wax crack or

6     whatever it was.  So we know there is evidence here to

7     support what I'm saying, which is that this phone could

8     have been answered by anybody.

9          Okay.  So on those counts, again 3, 5, 7, 16 and

10    17, there is nothing that ties Mr. Bennett to those buys.

11    We're asking you to find him not guilty on all those.

12          Now with regard to the issue of cocaine base or

13    cocaine base crack, I'll only say this.  I would submit to

14    you that the most reliable means of identifying a drug is

15    through chemical testing.  We stipulated to some of the

16    chemical testing.  We heard the young kid, Aaron Roemer

17    from the crime lab, testify.  He tested nearly everything

18    that's before you now and he said it's cocaine base.  It

19    was tested originally.  It was cocaine.  He retested it,

20    more specific testing.  It was cocaine base.  And I submit

21    to you that's reliable authority here.  To rely on

22    identification from anyone else who looks at it to say

23    that's crack is not reliable because crack is more in a

24    rock-like form.  So I'm asking you to go ahead and accept

25    the statement of the lab people that this is cocaine base

1    and on those counts where you have to make that

2    determination of cocaine base versus cocaine base crack,

3    only in the event you find a particular defendant or my

4    client specifically guilty, check the box that says

5    "cocaine base", not "cocaine base crack".  That's all I'm

6    going to say about that.

7            Now one of the other issues you're going to have

8    to consider is if a defendant -- if you determine a

9    defendant guilty of a particular count, Count 1, the

10   conspiracy, you're going to have to make some

11   determinations as to what the weight is.  Mr. Murphy

12   talked about it.  Mr. Loeffel talked about it.  I'm going

13   to talk about it.  I bet this is probably not the last

14   time you're going to hear it today.

15           When we're determining the weight, just based on

16   the controlled buys, I agree with Mr. Murphy's math on

17   this.  Just with the controlled buys, not including counts

18   1 or 2, not including anything else, 46 1/2 grams.  46 1/2

19   grams.

20           There was an issue -- an issue or evidence of a

21   car stop, a DUI stop I believe, on Terry Bennett wherein

22   they found 22 -- I think 22.2 grams of cocaine in his sock

23   or shoe.  There is -- again, as Mr. Loeffel said, lack of

24   evidence means lack of conspiracy.  As to that 22.2 grams,

25   just because Adrein Bennett and Terry Bennett share the

1    same last name and just because there's been evidence they

2    both may have had contact with cocaine in the past, there

3    is nothing whatsoever to link that 22.2 grams to Adrein

4    Bennett.  He wasn't in the car.  He wasn't mentioned at

5    all.  But because he may have delivered cocaine to an

6    agent on another occasion and because he knows Terry

7    Bennett, he should be held responsible for that

8    22.2 grams.  I submit to you that is wrong.  That 22.2,

9    when you're considering the weight of the conspiracy,

10   should not be counted because there is no evidence linking

11   it to Adrein Bennett whatsoever.  There's nothing there.

12          The other weight, I believe, Mr. Murphy wanted

13   you to add on or add in was that which Doug Sherman

14   mentioned.  Doug Sherman is the addict and the

15   co-defendant, the co-conspirator in this case, you will

16   recall, that testified that he blew $55,000 in settlement

17   money and he also received $2,000 a month in disability,

18   probably from that same injury.  It wasn't just the 55.

19   It was two grand a month for 18 months to two years.  His

20   testimony was -- again, he's ballparking it.  He doesn't

21   know how much he used.  It was a lot though because that's

22   a lot of money to spend on drugs.

23          His testimony -- and, again, what I say is not

24   evidence.  Please rely on your own memories.  If I say

25   something different than you remember, please don't hold

1    it against my client.  I'm just ballparking it myself.

2            Mr. Sherman said he bought from Adrein Bennett --

3    on his original statement he said 20 times.  On the stand

4    he said 40, maybe 20 of which were delivered by Adrein

5    Bennett.  Maybe some was delivered by other people.

6    That's the first time we heard that he told anyone

7    regarding Terry Bennett delivering to him at all.  All

8    total, I believe the total number was maybe 60 or 70 buys.

9    He typically spent $55 a pop, I think, which was half a

10   gram to two-tenths of a gram.  So $50 times 50 buys is

11   $2500.  Again, if my math is wrong, I apologize.  I did

12   that in my head real quick.  $2500.  He spent

13   conservatively $70,000 on cocaine.  He spent 2500 to --

14   let's give the benefit of the doubt -- $5,000 on something

15   that he apparently got through Adrein Bennett or any of

16   the other people that were mentioned.

17           But he's a part of the conspiracy.  He's charged

18   as a member of the conspiracy.  Apparently he's the only

19   user in the conspiracy by his own statement.  Yet he spent

20   $70,000 buying cocaine from other people.  Not the people

21   here.  Not the people he was spending time with, sharing

22   the house with, playing video games with or apparently who

23   he hung around with while it was cooked.  So a member of

24   the conspiracy, if he's a member of it, certainly wouldn't

25   have spent 60, $70,000 outside of the immediate company he

1    was allegedly keeping if he was a member of it.

2            I submit to you that coupled with his creative

3    thinking in coming up with trips to Springfield and

4    deliveries by Terry Bennett -- which he had never

5    mentioned prior to that.  Mr. Murphy said that the

6    agreement that he had with the Government was one that

7    would tend to bring the truth out.  Really?  Mr. Sherman

8    testified that he made the deal.  He told them everything.

9    He was completely honest.  Yet for the first time in

10   court, he gets up to the stand and changes his story.  He

11   changes the number of deliveries.  He adds deliveries.  He

12   adds other trips.  That's not an agreement that tended to

13   bring out the truth.  It left out a huge amount of alleged

14   truth.

15           In addition, there's been no lab tests about what

16   Mr. Sherman was doing, what he was ingesting, whether it

17   was cocaine or crack or heroin.  We're just taking his

18   word for it.  Now does he think he was smoking crack or

19   cocaine?  Yeah, I'm sure he does think that, but there's

20   no scientific support for it.  There is no scientific

21   evidence as to what the weight was, how much he used, how

22   much he got from any particular person.  All we know is he

23   spent all that money on drugs and he's an addict.  No

24   argument on that.  He used drugs while he was in a program

25   and getting the benefit of the State's help.  He still

1 | kept using drugs.

2 | So I don't want to spend much more time talking

3 | about his credibility other than to say he's not a

4 | scientist. He doesn't know what he was using. He

5 | doesn't -- he doesn't qualify in any way as a person who

6 | can tell you how much he used, which leaves you having to

7 | guess, leaves all of us having to guess. If you're going

8 | to take his word that he got that amount of drugs from any

9 | of the people involved in this case, you have to discount

10 | his testimony as to the weight because he doesn't

11 | remember. Maybe it was two-tenths of a gram. Maybe it

12 | was three-tenths of a gram. Maybe it was four-tenths of a

13 | gram. He didn't weigh it. He just got it and he smoked

14 | it. That's it.

15 | So when you're considering the weight of the

16 | conspiracy as applies to Mr. Bennett, again alternative

17 | argument, he's not guilty of conspiracy. That's what I'm

18 | submitting to you for all the reasons Mr. Loeffel set

19 | forth earlier. But in the event that you disagree with me

20 | and find him guilty, you have to determine what the weight

21 | of the material involved in the conspiracy is. We have

22 | 46 1/2 grams that the Government wants you to accept as

23 | somehow coming through Adrein Bennett. I'm asking you to

24 | discount the 22.2 grams that was recovered from Terry

25 | Bennett on an occasion completely unrelated to this. I'm

1    asking you to completely discount what Doug Sherman

2    claimed he had gotten because we don't -- there's no way

3    of knowing what that was.  There is no scientific proof of

4    weight or chemical analysis.

5              Count 18, the call placed to Adrien Bennett's

6    phone and a delivery made at some point later by Neashon

7    Washington, allegedly was 8 grams.  Adrein had nothing to

8    do with that 8 grams.  There is nothing tying him to that

9    8 grams.

10             So follow my math.  You take the 46 1/2 grams of

11   cocaine base that you held in your hand, the evidence.

12   Take off that 8 grams because Adrein did not touch that.

13   There is no evidence that he had anything to do with it.

14   That brings the total weight to 38 1/2 grams.  So in the

15   event you find Mr. Bennett guilty of the conspiracy, we're

16   asking you to consider that weight, 38 1/2 or 46 1/2.

17             When you see the form, it will give you

18   categories:  Less than 5 grams, 5 to 50, over 50.  What

19   I'm submitting to you is this should be less than 50.  If

20   you want to check the less than 5, super.  Less than 50,

21   great.  But there is no evidence to support anything over

22   50 grams in this case.

23             So, in conclusion, we're asking you to find

24   Mr. Bennett not guilty of Counts 3, 5, 7, 16 and 17 and

25   asking you to find that he had nothing to do whatsoever

1    with any conspiracy alleged here and that should you

2    disagree with me again on the conspiracy issue, the weight

3    is less than 50 grams.  Thank you.

4            THE COURT:  Thank you.  May I see counsel at

5    side bar?

6        (Following held out of the hearing of the jury)

7            THE COURT:  The lady in the front row, the girl

8    who is second from the right, front row, is aggressively

9    nodding her head up and down.  Somebody -- I don't know

10   who she's with here.  Somebody needs to tell her that she

11   has to stop nodding her head so aggressively or she's

12   going to have to leave the courtroom.  Does anybody know

13   who she is?

14           MR. PETRO:  In the jury or --

15           THE COURT:  The front row of the audience.

16           MR. LONERGAN:  I'll do it, Judge.  I'm done.

17           MR. MURPHY:  In addition, we just heard an

18   argument that Doug Sherman doesn't qualify as an expert.

19   The particular argument was he's not qualified.  We're

20   going to be tendering an instruction number 41.  We

21   understood that argument wasn't going to be made.

22           MR. LONERGAN:  Well, not an expert in chemical

23   analysis or in weights and measures.  I thought that's

24   what I had said.

25           MR. MURPHY:  Well, we can look it up.  I thought

```
 1  ║ you said --
 2  ║          MR. LONERGAN:  The record speaks for itself.  I
 3  ║ don't remember specifically what I said, but I thought
 4  ║ that's what I said.
 5  ║          THE COURT:  Well, I believe you said something
 6  ║ to the effect that he didn't really know what he was
 7  ║ using.  He knew -- knows what he believed he was using.
 8  ║          MR. PETRO:  Judge, I objected strenuously before
 9  ║ argument as to these two instructions that --
10  ║          MR. MURPHY:  Just one.
11  ║          MR. PETRO:  We have an instruction on expert
12  ║ testimony and proper -- I'm sorry.  The credibility of an
13  ║ expert, Judge.  It goes to that.  What this instruction
14  ║ does is it vouches for --
15  ║          THE COURT:  I do think there is some basis for
16  ║ giving it.  On the other hand --
17  ║          MR. PETRO:  You're supposed to take --
18  ║          THE COURT:  Just a moment.  If you want me to
19  ║ consider giving it, at the very least I would have to
20  ║ add -- this suggests that the only experts are people who
21  ║ deal with it on the street.
22  ║          MR. CHAMBERS:  This is another one, but these
23  ║ are sentencing cases and preponderance of the evidence
24  ║ cases, not reasonable doubt cases.
25  ║          MR. LOEFFEL:  Absolutely.
```

1            MR. PETRO:  I think we have an instruction on

2   expert testimony, Judge.

3            THE COURT:  I'm sorry?

4            MR. PETRO:  We had an instruction on expert

5   testimony.  They are allowed a rebuttal argument which the

6   defendants do not get and they can address this in their

7   rebuttal argument and we don't have that opportunity and

8   to put that instruction in, it misstates the --

9            THE COURT:  Does that mean the Government has no

10  recourse if an argument is made that they were told was

11  not going to be made?

12           MR. PETRO:  I don't know that it was made.  I'm

13  not agreeing that -- I didn't take it that way.

14           MR. LONERGAN:  The argument I made was not that

15  this wasn't crack.  It's simply that Mr. Sherman knows

16  what he was told he was doing.  That's what my argument

17  was.  I did not say that it wasn't crack cocaine.  I just

18  said don't conclude the weight.  These are the reasons

19  why --

20           MR. CHAMBERS:  I think the direct argument was

21  we can't trust Mr. Sherman's opinion because we didn't

22  have the lab test.  This says Mr. Sherman can tell us it's

23  crack.

24           MR. LOEFFEL:  At a sentencing hearing.

25           MR. CHAMBERS:  No.

1          MR. PETRO:  I think it stretches Douglas

2    Sherman's testimony to the absolute limits.  The guy is a

3    drug addict and he --

4          THE COURT:  What bothers me about this is the

5    way the first paragraph is worded.  It sounds like I'm

6    vouching for their testimony as opposed to -- I'm not

7    going to give it.  It's denied over objection.

8          (Following held in the hearing of the jury)

9                        **CLOSING ARGUMENT**

10                       **BY MR. PETRO**

11          Good morning.  How is everyone doing today?  I

12    would like to say they're saving the best for last, but I

13    don't see myself that way.  I mean, these guys are great

14    attorneys.  I take my hats off to them.  Great attorneys.

15    These guys over here are a couple of old pros.  I take my

16    hats off to them.  I stand in awe of everyone in this

17    courtroom.  And the Judge, obviously tremendous,

18    tremendous lawyer, tremendous judge, and I appreciate his

19    consideration to all the issues in this case.

20          I don't want to stipulate on everything that

21    everyone has talked about today, but the first thing, I

22    just want to let you know that your duty is an awesome

23    responsibility, but it's something that everyone across

24    the country is doing in courtrooms all around the country

25    right at this moment.  And the key thing to remember is

1     that in each and every courtroom in the United States of

2     America, we have what's called the golden rule of criminal

3     law.  That is proof beyond a reasonable doubt and

4     presumption of innocence.  Those are the two most

5     important things.

6          Now in this particular case, you are going to get

7     a packet of law from the Judge.  They are called

8     instructions, but it's just a packet of law.  This packet

9     of law comes from years and years and years and years of

10    doing cases in courtrooms around the country for a long,

11    long time.  These are the laws.

12         All right.  I want to start out in this

13    particular case that -- I'm just going to take it

14    chronologically.  At the beginning of the case, I made an

15    opening statement and what I told you at that opening

16    statement is that, look, you're never going to hear

17    Terry's voice on any video recordings.  That's absolutely

18    100 percent true.  You didn't hear Terry Bennett's voice

19    on any voice recording.  That's the truth, the absolute

20    truth.

21         The second thing I said is you never are going to

22    see Terry Bennett distributing any drugs.  That is the

23    absolute truth.  That is what Agent Brock told you.  Terry

24    Bennett never distributed any drugs to him.

25         The third thing is the Government has to prove

1    that the person in that vehicle was Terry Bennett.  That's

2    their burden beyond a reasonable doubt, that Terry Bennett

3    is the person in that car.  You guys have to find beyond a

4    reasonable doubt that that's Terry Bennett in the car.

5    And then I told you if you do find beyond a reasonable

6    doubt that that is Terry Bennett in the car, well, mere

7    presence is not enough.  Mere presence is not enough.  And

8    in this big packet of law here that you have, this is what

9    it says about mere presence.

10           All right.  The first thing that it says is that

11    a person's association with conspirators or a person

12    involved in a criminal enterprise is not by itself

13    sufficient to prove his participation as a member in the

14    conspiracy.  Just being around people that are doing bad

15    acts is not enough.  Mere presence is not enough.

16           The other thing that these well considered laws

17    do, it says here a defendant's presence at the scene of a

18    crime and knowledge that a crime is being committed is not

19    alone sufficient to establish the defendant's guilt.  Not

20    alone.  Not by itself.  All right.  Those are the key

21    words.

22           Now this thing here -- you've heard a lot of talk

23    about this over the course of this case.  You've got this

24    packet of law here, but you also have this packet of stuff

25    here called an indictment and, you know, you're going to

1     get an instruction on what this indictment is.  It's not

2     evidence.  I know it's not evidence, but all this is is a

3     way for the Government to accuse Terry Bennett as to what

4     he did wrong.  These are accusations.  That's what they

5     are.  After they accuse, then they've got to prove them

6     beyond a reasonable doubt.

7            But what is Terry Bennett charged with and how

8     does this instruction here regarding mere presence tie in?

9     Well, the first charge is Count 1, conspiracy.  It says

10    here:  "A defendant's association with persons involved in

11    a criminal enterprise is not by itself sufficient to prove

12    participation or membership in the conspiracy."  I realize

13    that the key words in that for you, folks, is "not by

14    itself".  "Not by itself."  Well, I'm going to tell you

15    what I think is important, all right?

16           Now what should you look for in deciding whether

17    Terry Bennett is a member of the conspiracy?  What things

18    are you looking for?  Well, I have here the phones right

19    here.  The phones.  All right?  Did you hear Terry Bennett

20    on any phone call negotiating price, quantity, location of

21    delivery, any of those things?  Mr. Murphy said to whom

22    the calls were made, who drove, how much delivered, who

23    delivered.  Did you ever hear Terry Bennett say any of

24    that stuff on the phone?  Absolutely not.  You never heard

25    Terry Bennett's voice.  That is absolutely 100 percent

1    true.  You never heard Terry Bennett's voice.

2              But the phones are more important, the phones are

3    more important, because what the Government is giving you

4    here -- I want to point this out.  This is Government

5    Exhibit 2-PR through 18-PR.  The 2 is for Count 2, 3 is

6    for Count 3, all the way to 18.  And why are these

7    important?  Well, if you look at it -- you remember the

8    testimony.  There was a certain amount of frustration at

9    some point because the witness went on and on.  Look at

10   this evidence when you go back to the jury room.  You

11   literally have -- you know, I think I added it up, but

12   you've got so many phone calls per day, per charge, and

13   you have like, from what I can tell, over 1200 phone calls

14   here to look at.

15             But why is this important?  "Mr. Petro, please

16   tell me why it's important.  You're driving me crazy."

17   I'm going to tell you why it's important.  Because you

18   never see in these phone calls, all these deals that are

19   going down, is there one phone call here that would

20   suggest that before these deals were made that someone

21   called Adrein Bennett to be part of this conspiracy?  If

22   you go look -- for instance, sometimes you go all the way

23   to, you know, four, five hours later.  Was there any phone

24   call afterwards to Terry Bennett?  There isn't any.  There

25   isn't any.  So the key word, the key word at this point by

1    itself, corroboration.  Is there any corroboration for the

2    accusations in this indictment?  Well, go back and look at

3    these 1200, 1300.  Count them up.  No evidence that would

4    suggest that any of the members that are alleged in this

5    conspiracy ever called Terry Bennett before or after.

6    Why?  Well, Terry is not a member of the conspiracy.

7    That's why.  Terry is not a member of the conspiracy.

8    That's why.

9          But let's go to the second thing.  Terry

10   supposedly is a member of this conspiracy and the second

11   thing that I have here is the members.  The members.

12   There's a number of people that are alleged in this

13   indictment that are accused of being part of this

14   conspiracy.  You don't see any contact between Terry and

15   all these people in this alleged conspiracy.  This Kontyus

16   and all these other folks, you do not see that.  You don't

17   see him in the car with this Doug Sherman.  I'll get to

18   him later.  But Doug Sherman, you don't see him in the car

19   with him.  You don't see him in the car with anyone except

20   they say that's Terry Bennett in the car with Adrein

21   Bennett on a couple of indications.  You just don't see

22   the contact between Terry Bennett and all these people

23   that are accused in this piece of paper called the

24   indictment.  Why?  Because Terry is not a member of any

25   conspiracy.  Remember, not by itself, mere association.

1    They've both got the same last name.  I know they've both

2    got the same last name and I know you folks have paid

3    attention and know they both have the same last name.

4    That's not by itself enough.  It's not by itself enough.

5              Let's see.  What else do I have here?  Locations.

6    Locations.  This is very, very important.  Very, very

7    important.  The Government has given you a road map to

8    their accusations in this indictment right here.  This is

9    where they tell you -- this is where they let us know what

10   we have to defend.  But the Government has also put in

11   some other things and some other locations and I want you

12   to check your memory, all right?  These locations are

13   important.  They are important enough for the Government

14   to bring up.

15             What are those locations?  Well, this Purtscher

16   address comes up over and over and over and over.  And the

17   Purtscher address, no one ever gets up on that stand and

18   says that they see Terry Bennett at this key location.  No

19   one ever testified to that.  Why?  Because Terry is not a

20   member of the conspiracy.  Supposedly this is like some

21   kind of HQ or headquarters.  Terry's never at the

22   headquarters.  Why?  Because he's not a member of the

23   conspiracy.

24             We heard some testimony that there was a gun

25   recovered on February 7 of 2004.  I don't remember the

1    locations, I don't remember the details, but they went to

2    the trouble of letting you know that this is an important

3    date.  This is an important event.  Four people were

4    arrested.  What do we know?  This is a key event.  Was

5    Terry Bennett there?  He was not there.  We have another

6    key location, another key event, and Terry Bennett is not

7    there.  Why isn't he there?  Because he's not a member of

8    the conspiracy.

9            Look at this last one here.  This is the one

10   that -- there's this one, some kind of search over at

11   1800 Bigelow or some kind of Bigelow Street here in Peoria

12   on February 16 of '06.  Remember that?  A big search.

13   They got all this stuff.  They went in and recovered all

14   that evidence.  You guys remember all about this.  They

15   had all this evidence.  Six people at this key location at

16   this key time.  Was any of these people Terry Bennett?

17   No.  Why?  Because Terry is not a member of the

18   conspiracy.  He's not a member of the conspiracy.  You

19   have these key locations that are brought up by the

20   Government to say that Terry is part of this larger thing,

21   but he's never there when he should be.  He's never there

22   when he should be.  Why?  Because Terry is not a member of

23   the conspiracy.

24           The third thing, the transactions.  Look, Terry

25   never delivered anything to anyone.  You heard Agent Brock

1    say that that is in fact the truth.  But that gets to the

2    second part of this mere presence instruction.  A

3    defendant's presence at the scene of the crime and

4    knowledge that a crime is being committed is not alone

5    sufficient to establish the defendant's guilt.

6          There's a lot of people that drove people around

7    in this particular case.  Some of them are known, some of

8    them are unknown.  You've heard testimony about unknown

9    people.  Look, Terry did not participate.  Go back and

10   look at that.  First, you've got to decide if that is

11   Terry and, second, you have to decide that he knowingly

12   participated.  All those registrations, this, that.  We

13   know that Adrein Bennett never drove a car.  He didn't

14   have a car.  A lot of people gave him rides, known and

15   unknown.  Even if you find that that's Terry Bennett in

16   that car, that alone is not enough.  That alone is not

17   enough.

18          Which gets me to the part that causes me so much

19   trouble and that's this guy Douglas Sherman.  You know,

20   maybe I just fell out of a tree, but Douglas Sherman wants

21   you to believe that he spent all this money and he's doing

22   all these drugs and I don't believe any of that.  He came

23   in.  He looked like he was --

24          MR. CHAMBERS:  Objection, Your Honor, to what

25   Mr. Petro believes.

1              THE COURT:  Sustained.  That's not an

2    appropriate comment to tell the jury what you believe.

3              MR. PETRO:  You have to --

4              THE COURT:  You are instructed to disregard his

5    opinion.

6              MR. PETRO:  Disregard my opinion.  You should

7    disregard my opinion.  Everything I say is not evidence.

8    Nothing is evidence.

9              Douglas Sherman is guilty of sinning in haste

10   and repenting in his leisure.  That's what he's guilty of.

11   That's what frustrates me about him.  I know I got mad at

12   him and I called him a few names and I hope you don't take

13   that out on me personally or out on Terry personally.  I'm

14   mad.  I was frustrated.

15             But Douglas Sherman at the time he was arrested

16   signed this statement and you saw the statement.  They put

17   it up there.  I agree to tell the truth, the whole truth,

18   nothing but the truth.  All right.  He signed it with

19   these people at this table over here, Mr. Nau, these

20   people over here.  He swore to tell the truth.  And what

21   do we know he told them about Terry Bennett?  Well, he

22   said he knew Terry Bennett and he lived on some street in

23   Peoria and that was it.  That was it.

24             Doug gets this deal of a lifetime.  You heard

25   what the sentencing ranges were for Doug, what he was

1    looking at.  He knew that.  He got indicted and before he

2    even talked to the Government, he knew what he was looking

3    at.  And despite the fact that he agreed to tell the truth

4    and what he was looking at, he was looking at a lot of

5    time in jail, etcetera, etcetera, etcetera, Doug says that

6    he knows that Terry Bennett lives on a street in Peoria

7    and that is it.

8              But what happened since then?  Well, Doug comes

9    in, he goes down to court, he throws up his hands and

10   says, "Put me in the program.  I don't like jail.  I'll do

11   anything."  He agrees to tell the truth and signs a

12   document and says, "Oh, I'm going to tell the truth.  I'm

13   going to tell the truth.  I'm going to follow the law.

14   I'm going to obey the laws.  I'm going to not use drugs.

15   I'm not going to break any laws."  Well, he did.  You

16   heard him get up there and you heard him say how after --

17   after he was put on bond in this case, he went out and

18   continued to break the laws.  That's the showcase of the

19   Government's case, a man that goes out and continues to

20   break the law after he has been accused, a man who is

21   given the opportunity of a lifetime and he uses it to lie

22   to the judge downstairs, Judge Gorman.  He uses it to lie

23   to you people.

24             You're going to get an instruction about Douglas

25   Sherman in this packet of laws here and it tells you about

1  Douglas Sherman.  Douglas Sherman has a motive to lie.

2  What these instructions will say is Douglas Sherman has

3  motive to lie.  He's been given a promise by the

4  Government.  Immunity, immunity, immunity.  You know, you

5  go get a shot, a flu shot.  You're immunized.  You can't

6  get the flu.  He has been given immunity.  You should look

7  at his testimony with great care and great caution.  Why?

8  Because these laws have been around for a long time and

9  people with these type of promises lie and lie and lie and

10  will do anything they can to save their hide and that's

11  what he did.

12          The other thing is he has a motive to lie and he

13  also has propensity to lie because he's an addict.  He's

14  an addict.  I have no idea as to what level of addict he

15  is, but he certainly doesn't take the 12 steps very

16  seriously because he kind of fell out after about four or

17  five.  But addicts lie.  They lie and they lie and they

18  lie.  He admitted he lied.  He lied to his parents.  He

19  lies to everyone.  It's called denial.  Denial is not a

20  river in Africa.  Denial is one of those phrases that we

21  hear every day on T.V.  People are in denial.  They don't

22  want to recognize the truth.  They can't tell the truth.

23  Addicts cannot tell the truth.  They can't.  He's got a

24  motive to life and he has a propensity to lie.  You cannot

25  accept what he says in any way, shape or form.

 1              And the final thing.  He had a motive to lie,

 2    propensity to lie, but he actually lied.  He actually lied

 3    to Judge Gorman downstairs.  He promised he wouldn't break

 4    the law.  You know what?  After 21 days in jail, he came

 5    in here and he changed his testimony and that's the simple

 6    fact.  That testimony that he gave, it's nowhere in these

 7    accusations by the Government, nowhere.  It's nowhere in

 8    there.  When he was arrested on April 26, the accusations

 9    that he made, they are not in there anywhere.

10              Which brings me to the last thing.  You're going

11    to get an instruction about inconsistent statements.  You

12    can use a statement made in court that's inconsistent with

13    prior statements to determine whether he's telling the

14    truth.  There are inconsistent statements.  That's what

15    the law said.  There are inconsistent statements here.

16              Finally, I just want to point this out.  I've

17    been talking about corroboration, the phone records I

18    talked about, the phone calls I talked about,

19    corroboration.  That's called corroboration, something

20    that makes the testimony of a witness more likely,

21    something that corroborates.  There is absolutely no

22    corroboration for what Douglas Sherman said in court.

23    None.  There's no pictures.  There's no phone calls.  He

24    mentioned that he knew one person's phone number.  There

25    is -- he didn't remember Terry Bennett's phone number.

1  You don't see Terry Bennett in Doug Sherman's car.

2  Coincidence?  No.  Terry doesn't know Doug Sherman.

3  That's what he said when they met on April 6 -- or April

4  of '06 when he met with the Government.  He knew him, but

5  he lived in Peoria.  That was all he knew.  Terry doesn't

6  know Doug Sherman.  It's not corroborated by any pictures

7  or phone calls or evidence or surveillance tapes or

8  officers outside.  It's not corroborated.  It's not

9  corroborated.  Because of that and because it's not in

10  these accusations by the Government, you should disregard

11  it.

12          The final thing is -- I don't think it's

13  important in deciding Terry's case.  Terry is not guilty.

14  The right thing to do is to let Terry go.  Terry is not a

15  member of the conspiracy.  It's supported by law.  It's

16  supported by evidence.  You've got to find that Terry was

17  at these locations in Counts 4 and 11 and, if you do, the

18  law is going to say he was just merely present without

19  something more, without something more.  There is nothing

20  more.  The right thing to do is let Terry Bennett go.

21  He's not a member of the conspiracy.  He never distributed

22  drugs to anyone.  Agent Brock told you that.

23          But I do want to comment just quickly on --

24  there was some expert testimony in this case and the

25  reason why -- I just want to state you're going to get an

1    instruction, all these laws here that the Judge is going

2    to read you.  He's going to read you all these laws.  And

3    you can get blindsided and baffled by people that come in

4    and they get this thing here that says that they're an

5    expert.  You guys are the judges of whether they're an

6    expert.  You can give the weight to their testimony that

7    you feel their expert credentials deserve.  You get to

8    pick that.  You get to determine what their qualifications

9    are.  That's your job.  You have to weigh -- the

10    instruction -- the law will tell you that you have to

11    weigh their testimony just like everyone else that steps

12    up and stands there.  That's the power that you folks

13    have.  It's an awesome power and I know you're up to the

14    challenge.

15            But what I want to say with respect to the

16    experts is, look, I'm not a scientist and you folks

17    probably are not scientists.  I can't remember if any of

18    you guys are scientists or anything like that.  But the

19    bottom line is the experts in this case are the guys with

20    the machines.

21            You know, way back when, I always remember I was

22    reading this book one time where they had these guys.

23    They were called phrenologists.  They were state of the

24    art.  They could feel a guy's head like this and feel the

25    bumps on his head and tell exactly what was wrong with

1  that person.  I'll just tell you, that was state of the

2  art at the time.  These phrenologists ruled the day.  They

3  were the experts.  They could read the bumps on your head

4  and tell you what's wrong with it.  But I guarantee you if

5  you went to the doctor tomorrow and said you were having

6  problems with shortness of breath and the doctor put his

7  hand on your head and started reading the bumps and told

8  you you've got to get surgery, you'd say, "Wait, Doc,

9  don't you got a machine somewhere?  Don't you got a

10  machine that will corroborate this somehow?"

11      You know, you can feel right here.  An expert

12  can tell you what your pulse is.  He can't tell you what

13  your blood pressure is.  The guys with the machines win.

14  They say it's cocaine base.  I mean, those guys sit in

15  that laboratory and it's a laboratory and they're

16  scientists.  They're called scientists.  They sit there

17  every day.  The one guy comes up here and testifies -- I

18  don't remember his name, but he testified that sometimes

19  he sees 25 of these samples a day.  25.  That's a lot.

20  25.  And he says he can't tell one from the other.  That's

21  why he uses the machine.

22      Which brings me to the last thing, the last

23  thing that it says on here:  "Mike, beware of the Indiana

24  sharpshooter."  I used to spend some time in Indiana, so

25  I'm allowed to dump on my brothers from Indiana here and

1  there.  But what is an Indiana sharpshooter?  While I was

2  in Indiana, an Indiana sharpshooter is a kid that stands

3  at the top of a hill with his rifle.  He points it at the

4  barn.  He fires that rifle, boom, right in the side of the

5  barn.  He runs down as fast as he can.  He finds the

6  bullet hole, pulls out his piece of chalk and he draws a

7  bullseye.  He draws a bullseye.

8          Officer Marion is an Indiana sharpshooter

9  because he knew what the results were.  He comes in here

10  and he draws a bullseye around that bullet hole in the

11  side of the barn.  He's not an expert.  The experts are

12  the guys with the machines.  Why not cut out the

13  middleman?  Why not cut him out?  Why not just bring all

14  the samples to Officer Marion?  Well, because it's not

15  reliable.  The scientists are called scientists because

16  their methods are reliable and those are the people that

17  you should believe.

18          To wrap it up, the evidence in this case shows

19  that Terry is not guilty.  The right thing to do is to let

20  Terry go.  Terry is not on the phone calls, the phone

21  recordings.  Terry is not in these 1400 pages, 1400 calls

22  in the phone records.  Terry is not at key locations.  You

23  don't see Terry in any cars or pictures or phone

24  conversations with anyone else in this case.  And if you

25  decide that that's Terry in that car, he was merely

1    present.  Mere presence.  That's it.  Not enough.  Not

2    alone.  Not enough.  That's what this instruction says.

3    Not alone.  Not enough.  There has to be something more.

4              I just want to bring up my brother's argument.

5    Mr. Murphy, in opening statement he gives you a road map

6    to whom the calls were made, who delivered, who drove and

7    how much delivered.  What did he say about Terry Bennett?

8    Terry was there.  Terry was there.  Mere presence.

9              I thank you for your attention.  The right thing

10   to do is to let Terry go.  He's not guilty.  That decision

11   is supported by evidence and that decision is supported by

12   law.  I trust you will do your job and thank you for your

13   attention.

14             THE COURT:  Thank you, Mr. Petro.  We're going

15   to have a side bar.

16        (Following held out of the hearing of the jury)

17             THE COURT:  There were comments by Mr. Lonergan

18   concerning the Sherman testimony.  In Mr. Petro's closing

19   argument, I believe he said specifically that the police

20   officer is not an expert.  In view of that, I have

21   prepared a revised version of Government's instruction

22   number 40 that informs the jury that based on experience,

23   crack users and experienced drug agents familiar with

24   crack are qualified to give an opinion and it's up to the

25   jury to determine how much weight, if any, to give that

1    opinion.

2                The last time we were here at side bar, I said I

3    wasn't going to give the instruction, but there is a

4    cumulative effect to these statements made and I think in

5    fairness to the Government they are entitled to this

6    instruction.

7                What I've done here is rewrite the first

8    paragraph so that it makes it clear that they don't have

9    to give it any weight if that's their decision, but I

10   think they need to be informed just as I have stated here.

11   So I assume defense counsel objects to this.

12               MR. LONERGAN:  I object in general and also

13   specifically to that second sentence or second paragraph

14   that the Court inserted regarding basically the testimony

15   of an expert --

16               THE COURT:  Actually, let me interrupt a minute.

17   I'm not at all sure we need that second paragraph.  Why

18   don't we --

19               MR. CHAMBERS:  The one we did had taken that

20   out because when you read the cases --

21               THE COURT:  Here's my --

22               MR. LONERGAN:  I still have a general objection.

23               THE COURT:  I'm going to have it retyped with

24   the second paragraph out.  Then we'll show it as given

25   over each of the defendants' objections.  Does the

1    Government also object?

2                    MR. CHAMBERS:  No.

3                    MR. PETRO:  May I just -- this word

4    "experienced" here, I mean it seems like that word itself

5    is vouching for these particular --

6                    MR. CHAMBERS:  Your Honor, that's right out

7    of --

8                    THE COURT:  You can make that point.  That's the

9    form in which I'm going to give it.

10              (Following held in the hearing of the jury)

11                    MR. CHAMBERS:  Your Honor, by our clock I have

12    27 minutes.  Does that sound about right?

13                    THE COURT:  All right.  You don't have to use

14    all of it.

15                    MR. CHAMBERS:  Can I have possibly a five

16    minute --

17                    THE COURT:  Go ahead.  I'll let you know.

18                      **REBUTTAL CLOSING ARGUMENT**

19                          **BY MR. CHAMBERS**

20              Folks, I'm the last one that you have to listen

21    to.  When I sit down, you will get the instructions from

22    the Court and then you can climb those steps and begin

23    your deliberations.  So I've got a little less now than 27

24    minutes and what I'm here to do is to try to respond to

25    various points made by counsel when they stood up here.

1           Let me start with what we heard last,

2    Mr. Petro's repeated use of the phrase mere presence, mere

3    presence, mere presence.  He read that jury instruction

4    mere presence about five or six different times.  Ladies

5    and gentlemen, this is not a mere presence case.  Terry

6    Bennett drove Adrein Bennett to two drug sales, Counts 4

7    and Count 11.  He drove him to those two transactions.  On

8    Count 4, they actually had -- on Count 4, they actually

9    did the transaction across his lap.  It falls in Terry's

10   lap and Adrein picks it up, hands it to the agent.  Mere

11   presence?  That's not mere presence.  He said, "Well, we

12   don't know it was Terry."  Well, it was Terry.  There's

13   Terry sitting there smiling while Adrein sells the drugs

14   to the agent.

15           And then on the other one, that's Count 11,

16   September 13, Terry is driving again.  There he is.  It's

17   hard to see on the stills, but you can see it in the

18   video.  That's him over there with his hand up.  Remember

19   how he had his hand up like this?  He took it down.  Why

20   did he put his hand up?  What was he doing that he needed

21   to hide his face from the agent?  There is Adrein telling

22   him how much he wants.  He wants $300 for the deal.  This

23   is not a mere presence case.

24           Also, you heard evidence.  Doug Sherman said

25   that he ordered from Adrein and Terry delivered.  That's

1    not mere presence.  And that he bought directly from Terry

2    15 to 20 times.  That's not mere presence.  And then Terry

3    is caught with 20 grams -- 22 grams of crack cocaine in

4    that car stop stuck in his sock right there in the middle

5    of the conspiracy.

6              The Judge is going to tell you that you can make

7    reasonable inferences from the evidence.  I would submit

8    to you that a reasonable inference is that he had the

9    stash going from one location to another for all these

10   deals.  They did a deal the day before on October 26 and

11   this is the car stop on October 27.  This is not a mere

12   presence case.

13             Mr. Petro is right.  He's not on tape.  Well, he

14   simply didn't have a speaking part, folks, but the role

15   that he had was very important.  He drove Adrein to the

16   two deals.  He delivered directly to Doug Sherman.  And

17   then he -- when Doug ordered from Adrein, he delivered

18   directly to Doug 15, 20 times in addition and he got

19   caught transporting that 20 grams.

20             So he read the mere presence instruction to you

21   four or five times.  The Judge is also going to give you

22   some other instructions.  Those are -- one is commonly

23   called the aiding and abetting instruction.  The Court

24   will tell you that any person who knowingly aids the

25   commission of an offense may be found guilty of that

1    offense.  The person must knowingly associate with the

2    criminal activity, participate in the activity and try to

3    make it succeed.

4            And he's also going to give you another

5    instruction that says an offense may be committed by more

6    than one person.  A defendant's guilt may be established

7    without proof that the defendant personally performed

8    every act constituting the crime charged.  So you're also

9    going to get those instructions because, folks, that's the

10   law.  This is not a mere presence case.

11           He also talks about the phone tolls.  Remember

12   the argument about the phone tolls?  What was the phone

13   that he was using?  This is Adrein's drug phone, the

14   number you call -- if you're Doug Sherman, if you're Steve

15   Brock, the undercover agent, the number you call to order

16   the drugs that Adrein sends either himself, he comes out,

17   or sends one of his guys out to deliver the drugs.  That's

18   the number.  That's the number he was calling.  Would you

19   expect to see calls between Adrein and Terry on that

20   number?  I would suggest to you, submit to you, that you

21   wouldn't.

22           Then we come to the argument, I think you heard

23   it in some form or another from just about everybody up

24   here, the idea that what we have here is cocaine base and

25   not cocaine base crack.

1          Before I get into that, I'm going to read you an
2    instruction that the Judge is going to give you.  He's
3    going to tell you to use your common sense in weighing the
4    evidence and consider the evidence in light of your own
5    observations in life.  Use your common sense.
6          Loren Marion told you there are two kinds of
7    cocaine base.  There's the coca paste they find down in
8    the jungles of Peru and Columbia when they're making the
9    cocaine hydrochloride and there's crack on the streets of
10    Peoria.  And the only kind of base he has ever seen, ever
11    seen in Peoria, is crack.
12          Doug Sherman, the guy who was buying it, spent
13    $50,000 plus.  These guys were hauling his bed and his
14    microwave, his refrigerator out of his house in return for
15    crack.  He said he was buying crack.  That's the only kind
16    of cocaine base found in Peoria.
17          And then Loren Marion looked at each of the
18    packages, went through each one of these.  And you got a
19    chance to look at them.  Count 2 he said looked like
20    powder cocaine, Count 2, but the rest of it looked like
21    crack cocaine.  Folks, this is not coca paste.  This is
22    crack cocaine.  Cocaine base coca paste.  Cocaine base
23    crack.  This is crack.
24          Well, Mr. Petro said you can only believe the
25    guys with the machines, the scientists.  Well, we had

1 | machines in this case.  Because you remember how you

2 | determine whether or not a substance is cocaine base

3 | crack?  It's not just a one-step process.  The agent buys

4 | the substance on the street and he looks at it.  He feels

5 | it.  He makes a preliminary determination, preliminary

6 | determination.  Then he does the Valtox kit, the field

7 | test kit.  He makes another preliminary determination.  It

8 | looks like crack.  It tests positive for cocaine.  Then

9 | what he does he do with it?  He sends it off to the lab

10 | and the guys with the machines, the guys with scientist

11 | before their names, make another determination.  They

12 | determine that it is some form of cocaine base and they

13 | come back with their report.  This is some form of cocaine

14 | base.  So if you have the preliminary determination that

15 | it looks like and feels like crack and it tests positive

16 | for cocaine on the field test and it comes back from the

17 | lab as a form of cocaine base, what do you have?  You have

18 | crack.  That's what you have.  Use your common sense.

19 | Let's go back -- I want to try to get to as many

20 | of them in the time that I have.  Let's go back to

21 | Mr. Loeffel's argument on behalf of Neashon Washington

22 | where he talked about all of the mistakes in this case.

23 | One mistake was he said that nobody ever identified the

24 | unknown male on that November 15 deal as his client,

25 | Neashon.  I would suggest to you that's not true.  The

1    transcript says "unknown male", but Steve Brock clearly

2    identified the voice as Neashon.  What does Neashon say?

3    "I'm on my way."  Or "I'm coming."  Who shows up?  Neashon

4    Washington.

5        He also said that Steve Brock was mistaken about

6    the words used to threaten him.  Well, Mr. Loeffel may not

7    like those words or the interpretation that Mr. Brock gave

8    to those words, Agent Brock gave to those words, but Agent

9    Brock was the one out on the street that day and he was

10   able to look into the eyes of Neashon Washington and hear

11   the words that he used and know what those words meant and

12   he came in here and told you that he felt threatened, that

13   he felt like those were threatening words.  They weren't

14   the same words that Adrein used when he said, "I'm going

15   to kill you."  They weren't that explicit.  But they were

16   still in his mind, as the man who sat a foot away from

17   him, looked in his eyes, threatening words.  That's not a

18   mistake.

19       He also said that Agent Brock misidentified

20   Count 2 as cocaine base crack.  Well, I would submit to

21   you that when we passed this around -- this is the lab

22   sheet that Steve filled out when he sent it over to the

23   lab -- that when we passed this around and passed all

24   these around, in all of these Steve filled out the words

25   "cocaine base crack" or "crack" when he sent them over to

1    the lab.  But with Count 2, before it even went to the

2    lab, Steve didn't write that.  Steve wrote the words

3    "cocaine" on this one.  What mistake did Steve Brock make

4    there?

5          He also claims that Steve misidentified who was

6    the passenger and who was a driver on Count 6.  I would

7    submit to you, use your own memory here, that it was

8    Mr. Loeffel that made the misidentification.  In asking

9    the question, he switched them back and the agent

10   corrected him and told him, no, that's not the way it was,

11   that Neashon was driving and Adrein was on the other side.

12   No physical evidence connecting Neashon Washington to this

13   conspiracy?  I would submit to you that the physical

14   evidence is overwhelming, overwhelming.

15         Count 2.  Neashon is driving Doug Sherman's

16   Jeep.  Adrein delivers.

17         Count 6.  Neashon is the passenger.  The deal

18   goes right across his belly.  Let's see if I can kind that

19   picture.  Count 6.  He's the passenger.  It goes right

20   across his belly.  Here it is.  That's Neashon and the

21   deal is going right across his belly.  No evidence

22   connecting him to these deals?

23         Count 14.  Neashon and Adrein are there for the

24   delivery and they have the unknown black male make the

25   delivery.  That's pretty direct evidence, folks.

1          What about even more direct than that?  What

2     about Count 3, Count 5, Count 7, Count 16, Count 17 and

3     Count 18 where Neashon delivers it himself?  That's direct

4     evidence.  Direct evidence.

5          He claims the evidence falls short.  I would

6     submit to you that the evidence is overwhelming of Neashon

7     Washington's involvement in this conspiracy.  He's there

8     at the beginning for the first deal and he's there at the

9     end for the last deal.  He's there throughout.

10          But he says, "Well, there's no evidence that he

11    knows everybody."  I think a couple of these gentlemen

12    made that argument.  "There's no evidence that he knows

13    everybody."  "You haven't shown that Neashon knows this

14    person or knows this person."  I suggest to you that the

15    Court is going to give you an instruction of law that

16    tells you that all the members of the conspiracy don't

17    have to know each other.  They don't have to join at the

18    beginning, they don't have to stay thought all the

19    conspiracy and they don't have to know each other.  That

20    is the law.

21          Mr. Lonergan says that Mr. Murphy kept saying

22    "organization".  Actually I think he used the word once,

23    but the word he used was "business".  And he said,

24    "Where's the organization?  Where is the business?"

25    Folks, you heard about the business.  You heard about the

1    business that Adrein Bennett was running.  You call Adrein

2    and you order and either Adrein delivers to you or

3    somebody else delivers to you on his behalf.  One of these

4    two gentlemen right here were some of those people that

5    delivered to you on his behalf.  That's the business that

6    Adrein was running.

7              I'm starting to run out of time, but I want to

8    touch on one more thing before I sit down.  What I want to

9    touch on is Doug Sherman.  Everybody up here took a shot

10   at Doug Sherman.  Everybody up here said, "You can't

11   believe Doug Sherman.  His memory is no good.  He can't

12   tell you the exact dates.  He can't tell you the exact

13   places.  He can't tell you the exact amounts."  So he must

14   be lying to you, right, because he can't remember that.

15             Let's see.  This is February of '07.  Did you go

16   see a movie in February of '06?  Well, for me, I would

17   remember that exactly because I don't get to go see very

18   many, but maybe you do.  Maybe you see a lot of movies.

19   Did you see one in February of '06?  Where did you sit?

20   Which theater was it?  Was it one of those multi-plexes?

21   Was it the second theater on the right or the fourth one

22   down on the left?  What did you have to drink?  Did you

23   get the package with the big drink and the big popcorn or

24   did you get the medium that day because you had just had

25   dinner and you didn't feel very hungry?  What was your

1    ticket price?  You don't remember?  You don't?  Are you

2    lying to me that you went and saw the movie?  No.  You can

3    remember the plot of the movie.  You can probably remember

4    the actors and actresses.  You can remember what happened

5    in that movie.  You and I can sit and have a conversation

6    about what happened in that movie.  But because you can't

7    remember the details doesn't mean you're lying.  That's

8    the same with Doug Sherman.  Just because he can't tell

9    you the details doesn't mean he's lying.

10            Mr. Murphy made reference this is a miserable

11   life and, folks, it is.  A drug conspiracy is a sewer and

12   there are no swans in the sewer.  But because Doug Sherman

13   is not a swan doesn't mean he's lying.  Yeah, Mr. Murphy

14   and I would like to bring in the parish priest or your

15   child's third grade teacher and have him or her testify.

16   But, you see, the problem is that your parish priest and

17   your child's third grade teacher didn't deal drugs with

18   Adrein Bennett, Neashon Washington or Terry Bennett, but

19   Doug Sherman did.

20            And we don't bring him in here naked.  We don't

21   parade him in here in front of you with no clothes on and

22   sit him up there naked.  He is clothed in corroboration.

23   Mr. Petro says no corroboration.  I would submit to you

24   there is overwhelming corroboration in this case.  He is

25   clothed in the corroboration of direct evidence and of

1    circumstantial evidence.

2            Let's start with the circumstantial evidence.

3    The Court is going to tell you that you can consider

4    circumstantial evidence just the way you consider direct

5    evidence.  You know, out there beyond the courtroom walls,

6    people say, "Oh, that's circumstantial evidence."  Well,

7    in here you can consider both of them because there is a

8    good reason you can consider them.

9            Here's circumstantial evidence.  It doesn't

10   apply too much right now, but let's say in a couple of

11   weeks after this heat wave or this warming trend gets rid

12   of all this snow, you go to bed at night.  You look

13   outside and you let the dog out, you go get the dog, bring

14   it back in.  There's no snow anywhere to be seen.  You

15   wake up the next morning to take the dog out again and now

16   what do you see?  You see a foot of snow.  What do you

17   know?  What do you know?  You know it snowed last night.

18   How do you know?  You were asleep.  You didn't see it.

19   Nobody told you it snowed last night, but there it is.

20   And that's circumstantial evidence and you can consider

21   circumstantial evidence exactly like you consider direct

22   evidence.

23            Circumstantial evidence in this case.  These

24   guys are running a drug operation.  What are the tools of

25   the trade of the drug operation?  These.  They find them

1  in the house where they are.  They find the guns in the

2  house along with the plate, along with the plate with the

3  crack cocaine and Adrein Bennett's fingerprints on the

4  plate up there in the bedroom.  You know from what Doug

5  Sherman told you that none of these guys used this stuff.

6  They just deal it for profit.  They don't use their own

7  product.  Circumstantial evidence that there is a business

8  going on.

9         But in this case we don't say there's only

10  circumstantial evidence.  We also ask you to rely upon the

11  direct evidence.  Doug Sherman told you he would order

12  from Adrein on his cell phone and then either Adrein,

13  Neashon, Terry or Kontyus would show up and make the

14  delivery.  What did you hear on the tapes?  What did you

15  see on the video?  The agent orders it up from Adrein and

16  then who shows up?  Adrein, Neashon, Terry or Kontyus.

17  Just like Doug Sherman told you.  Those tapes don't lie,

18  folks.  Those videos don't lie.  He's clothed completely

19  in corroboration.  I would submit to you that

20  corroboration is overwhelming.

21         Okay.  I'm done, but you're not.  Now a

22  different phase of your work starts.  You've got to climb

23  those stairs and make a decision on whether or not we have

24  met our burden beyond a reasonable doubt of proving these

25  various counts.  You've got all the facts.  You've heard

1    them over the last week.  The Judge is getting ready to

2    give you all the jury instructions, the law.  So you've

3    got the facts, you've got the law and, folks, as you walk

4    up those steps, carry your common sense with you too.  I

5    submit to you that when you apply your common sense to the

6    facts and to the law, that you will find all three of

7    these defendants guilty as they are charged.  Thanks.

8

9                    **\* \* \* TRANSCRIPT CONCLUDED \* \* \***

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

**REPORTER'S CERTIFICATE**

2

3          I, Karen S. Hanna, certify that the

4     foregoing transcript constitutes a true and accurate

5     transcript of the original shorthand notes of the

6     proceedings had at the time and place aforesaid

7     before the HONORABLE MICHAEL M. MIHM, U.S. District

8     Judge.

9

10                              s/ Karen S. Hanna
                                Karen S. Hanna, C.S.R.
11                              License #084-001760

12

13

14

15

16

17

18

19

20

21

22

23

24

25